# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF ESSEX, NOVEMBER TERM 1827, AT SALEM.

PRESENT·

Hon. ISAAC PARKER, Chief Justice,
Hon. SAMUEL PUTNAM,
Hon. SAMUEL S. WILDE, } Justices.
Hon. MARCUS MORTON,

---

## The Inhabitants of Newbury *versus* The Inhabitants of Harvard.

Where a stranger was received and entertained by an inhabitant of a town, previous to April 10, 1767, and his residence there was designedly concealed, so that the town officers had no opportunity to warn him to depart, it was *held*, that he did not gain a settlement.

Assumpsit for expenses incurred in the support of Elizabeth Foss, a pauper.

At the trial, before *Putnam* J., it was proved, that the pauper was a granddaughter of Shadrach Ireland, a teacher of certain peculiar doctrines in religion, and derived her settlement from him. He fled from Charlestown in 1760, to Harvard, to avoid a prosecution for blasphemy, and lived there in great

privacy till 1780, when he died there.* His wife and four children remained at Charlestown.

It appeared from depositions in the case, that Ireland, upon going to Harvard, lived for ten or twelve years at the house of Samuel Cooper, who was one of his followers. The house was in a retired place, no public or private road leading to it or very near it, and the land about it not being cleared. The nearest neighbours were a widow and her two daughters, who lived a quarter of a mile to the north, and Isaac Willard, another follower, who with his family lived half a mile to the s u.h. Ireland occupied a chamber in Cooper's house. A string, connected with a clapper, passed through the floor into the room occupied by the family, and when any person approached the house, the string was pulled to give him notice to keep in his chamber; and when a daughter of one of his followers, after he had lived with Cooper eight or nine years, told his name to a daughter of Cooper, it was with an injunction of secrecy. He had likewise a place in the barn to which he occasionally retired, to be in still greater privacy. He was not called by his proper name, but the elder persons in the family called him " brother," and the children " uncle," or " uncle Jewett "; and sometimes he was called " the

---

* The following extracts from Backus's Church History of New England, were made a part of the case. " And near the close of the year 1749, a number of people in Easton and Norton made so high a profession of being led into believer's baptism, that no ordained minister in the land would do to administer it to them. But they met by a place of water, and one would baptize another, and then he the next; so that about twenty persons were dipped, by four or five administrators among themselves. Parting from their lawful wives and husbands, and taking of others, immediately followed, until some bastard children were born among them, with many other abominations:" *p.* 209. " Another essential truth of the gospel is, that we must daily deny ourselves and take up our cross, or we cannot be Christ's disciples ; but this truth has often been held in unrighteousness in every age. The people mentioned *p.* 209, run to a great length in that way. A man from Charlestown, near Boston, was at their head, who about 1758, assumed God's essential prerogatives in such a blasphemous manner, that he was complained of to authority, upon which he fled, and his followers concealed him for many years, and a house was built for that purpose in Harvard, where they privately resorted to him, who declared himself to be perfect and immortal, until death arrested him, and he was buried with great secrecy. Since which the same house in Harvard has been made the head-quarters of a small company from Britain, who have a woman for their head." *p.* 409. *Reporter*

man." Sometime after he had resided there, a back lean-to was erected, in which he worked at his business of a cabinet-maker, and a cellar was dug under it and connected by stairs with his chamber, so that he could go down unobserved when he pleased. He never ate with the family, but alone in his chamber, where his food was carried to him. When he happened to be out of the house, and any stranger was there, some one of the family was sent to tell him, in order that he might come in privately. He often went to Willard's, but always in the evening, and upon approaching the house he made a signal, upon which some one would go out to him, and if none but members of the family were in the house, he would go in. His followers, from six to ten in number, used to visit him, and he would converse with them and exhort them. There was no formality in these meetings. They be gan soon after he went to Harvard. About three families of his followers, and who were such before he left Charlestown, lived in Harvard; others who visited him were from Grafton, Cambridge, Hollis, Littleton, and some other places. A wo man by the name of Burt was one of his hearers, in opposition to the wishes of her husband, who was an inhabitant of Harvard. After Ireland had resided in Harvard ten or twelve years, he purchased of Willard a parcel of land, on which his followers built him a house, called the "square house," and there he resided during the remainder of his life, still keeping his true name a secret, and seeing no persons except his followers.

A verdict was taken for the plaintiffs; and if Ireland had such a residence as the law required, to gain a settlement in Harvard, prior to April 10, 1767, (the date of *Prov. St.* 7 *Geo.* 3, *c.* 3.) judgment was to be rendered upon the verdict; but if not, the plaintiffs were to become nonsuit.

*Pickering* and *Hind*, for the defendants, contended that this concealed residence did not come within the meaning of *Prov. St.* 12 and 13 *Will.* 3, *c.* 10, § 3, under which a person might gain a settlement by a residence in a town for twelve months, unless warned to leave the town. The selectmen of Harvard were guilty of no laches in not warning Ireland. The concealment of his residence there was a gross fraud upon

*Newbury v. Harvard.*

*Nov. 9th*

Newbury
v.
Harvard.

them. Further, his domicile continued in Charlestown. *Hard-wick* v. *Raynham*, 14 Mass. R. 363 ; *Chelsea* v. *Malden*, 4 Mass. R. 134 ; *Great Barrington* v. *Lancaster*, 14 Mass. R. 256, 257 ; 1 Bl. Com. 363 ; Com. Dig. *Justices of Peace*, *B* 72 ; *The King* v. *St. Michael's*, 2 Doug. 630 ; *Claverack* v. *Hudson*, 15 Johns. R. 283 ; *White* v. *Bailey*, 3 Mass. R. 271 ; *First Mass. Turnp. Corp.* v. *Field*, ibid. 201 ; *Fowler* v. *Hunt*, 10 Johns. R. 465.

*Gerrish*, for the plaintiffs, referred to Anc. Charters, &c., 173, 251, 364, 508, and he contended, that it was to be in ferred from *Prov. St.* 10 *Geo.* 2, *c.* 3, (Anc. Chart. &c. 508,) that a residence, though secret, would give a settlement, as the town had a remedy against the inhabitant who should entertain a person not an inhabitant. But Ireland's residence was not a secret. It was known to several inhabitants, and among them to Burt, who was not one of his followers, and who might have given notice to the selectmen. If a writ against the town had been served on Cooper or Willard, the service would have been sufficient, (*St.* 1785, *c.* 76, § 8,) and with equal reason their knowledge of Ireland's residence should be deemed notice to the town.

*Nov. 10th.*

*Per Curiam.* It appears that Ireland lived in Harvard long enough to gain a settlement, but the defence is, that he fled from Charlestown, being indicted for blasphemy, and went to Harvard as a place of concealment, and used means to keep himself concealed, being known to be there, by his true name, by only some few followers, on whom secrecy was enjoined in regard to his dwellingplace. The law provided a method by which the inhabitants of a town might avoid becoming liable for the support of a stranger, who should make it the place of his residence, and an opportunity ought to be afforded them to pursue the course prescribed. If a person should conceal himself in a cave, like some of king Charles's judges, the town, being ignorant of it, could not warn him to depart, and ought not to be charged for his support. It is objected, on the part of the plaintiffs, that every inhabitant of a town, who entertained a stranger, was bound to disclose to the selectmen or town clerk the fact that such person had come there to re-side, and this under a penalty of forty shillings, besides being

liable to answer all charges which might arise in the town by entertaining him. The argument struck us as being of some force ; we think, however, upon consideration, that the statute applies to the common cases, where no concealment is attempted. There the penalty might induce an inhabitant to make a disclosure to the town officers, or they might themselves discover that a stranger had taken up his residence among them. But in the case before us, there was an actual concealment by inhabitants, from motives stronger than their duty under the law. We are all of opinion that the verdict should be set aside.